**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>100 Pearl Street, Suite 20-100<br>New York, NY 10004,<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HIMANSHU JINDAL a/k/a MANISH JINDAL,**<br>A-80 EF Shiv Nagar<br>Murlipura, Jaipur<br>Rajasthan, India 302013,<br><br>**Defendant.** | **Case No. 1:26-cv-3476**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Himanshu Jindal (a/k/a Manish Jindal) ("Jindal" or "Defendant"), alleges as follows:

## SUMMARY

1. The Commission brings this action against Jindal for engaging in securities fraud by (a) misrepresenting to a public company that he was a U.S. Certified Public Accountant ("CPA") affiliated with an accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"); and (b) providing the public company a phony audit report on its fiscal year 2023 financial statements for inclusion in its annual report on Form 10-K filed with the Commission.

2. In or about August 2023, Cyber Apps World Inc. (n/k/a Leopard Energy, Inc.) ("Cyber Apps"), a publicly traded issuer whose common stock is registered with the

Commission, sought a PCAOB-registered auditor to audit its fiscal year 2023 financial statements required to be included in its Form 10-K.

3. Jindal procured the audit engagement with Cyber Apps by misrepresenting that (a) he was a CPA affiliated with an accounting firm ("Accounting Firm A"); and (b) Accounting Firm A was registered with the PCAOB. Jindal made these representations without Accounting Firm A's authorization or knowledge.

4. Jindal provided Cyber Apps with a fraudulent engagement letter and a fabricated audit report for its Form 10-K, and obtained $2,500 in audit fees from Cyber Apps by directing payment to an entity he controlled.

5. Jindal's fake audit report included the unauthorized electronic signature of Accounting Firm A's principal; false representations that Accounting Firm A was registered with the PCAOB and had conducted the audit in accordance with PCAOB standards; and a false opinion that Cyber Apps' financial statements were presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles.

6. On October 25, 2023, Cyber Apps filed its Form 10-K with the Commission, making Cyber Apps' financial statements and Jindal's fake audit report publicly available to investors.

7. Subsequently, when Cyber Apps learned that Accounting Firm A was not registered with the PCAOB, it later retained a new, PCAOB-registered auditor and filed an amended fiscal year 2023 Form 10-K that restated its financial statements.

## VIOLATIONS

8. By virtue of the foregoing conduct and as alleged further herein: (a) Defendant Jindal violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and (b) Defendant Jindal is liable under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting Cyber Apps' violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-1 [17 C.F.R. § 240.13a-1] thereunder.

9. Unless Defendant Jindal is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of a similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) permanently prohibiting Defendant from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit; (c) ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, as a result of the violations alleged herein, and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

13. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(c)(3). Certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including causing Cyber Apps to incorporate the fabricated audit report in its Form 10-K for filing with the Commission in the District of Columbia. Additionally, Defendant is not resident in the United States.

## DEFENDANT

15. **Jindal**, age 31, is a citizen of India who resides in Jaipur, Rajasthan, India. Jindal has never been licensed as an accountant in the United States or elsewhere, and has never been affiliated with a licensed accounting firm or PCAOB-registered accounting firm. At all relevant times, Jindal has been a 50 percent owner and director of **Helponic Global Private Limited** ("Helponic Global"), a private limited company registered in 2022 in Jaipur, India. In May 2024, on behalf of Helponic Global, Jindal formed a Wyoming limited liability company called **Helponic Global LLC**, for which Jindal also signed and filed annual reports in 2025 and 2026 to maintain the entity as an active company in good standing.

## OTHER RELEVANT ENTITIES

16. **Cyber Apps** is a Nevada corporation incorporated in July 2002. Since August 2023, Cyber Apps has been headquartered in Switzerland. At all relevant times, its common

stock has been registered with the Commission pursuant to Section 12(g) of the Exchange Act and quoted on the OTC Pink tier of the OTC Markets. As of July 31, 2023, Cyber Apps purported to be in the business of the development of mobile applications. In August 2023, Zenith Energy Ltd. ("Zenith")—a publicly held Canadian corporation based in Vancouver, British Columbia—purchased a controlling interest in Cyber Apps. As part of that transaction, certain officers and directors of Zenith became Cyber Apps' officers and directors. As of October 2023, Cyber Apps reported that in addition to continuing with its present business, it was exploring potential expansion into other business sectors, including the acquisition of energy production and development opportunities in the U.S. In April 2024, Cyber Apps changed its name to Leopard Energy, Inc.

17. **Accounting Firm A** is a professional service corporation organized under New York law and headquartered in New Hyde Park, New York. It is licensed as an accounting firm by the New York State Education Department Office of the Professions. Accounting Firm A's PCAOB registration has been revoked since April 2020. Jindal has never been affiliated with Accounting Firm A.

## FACTS

### I. BACKGROUND

18. At all relevant times, Cyber Apps was an issuer of securities registered pursuant to Exchange Act Section 12(g) and required to file annual reports on Forms 10-K with the Commission.

19. Cyber Apps was required to file with the Commission a Form 10-K annual report for its fiscal year ended July 31, 2023, by October 30, 2023.

20. An annual report on Form 10-K is required to include financial statements audited

by a PCAOB-registered independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon.

21. An audit opinion is the auditor's professional conclusion, expressed in the audit report, that the financial statements are fairly presented, in all material respects, in conformity with the applicable financial reporting framework.

22. The annual reports on Form 10-K, and the audit reports contained therein, are important to investors because the audit report attests to the reliability of the company's financial statements.

**II. JINDAL'S FRAUDULENT AUDIT SCHEME**

23. Jindal has no educational background in accounting, has never been licensed as an accountant in the United States or elsewhere, and has never been affiliated with a licensed accounting firm in the United States or a PCAOB-registered accounting firm.

24. Jindal's highest level of education is a high school degree he obtained in India in 2014, and a partially completed undergraduate engineering and technology program in India from which he took a leave of absence in 2017, and which he never completed.

25. From at least August 2023, Jindal engaged in a deceptive scheme to obtain audit work in the United States by falsely representing his credentials and professional affiliation and by using fraudulent and forged documents.

26. In or around July 2023, Cyber Apps' then-auditor advised the company that it would no longer offer PCAOB audit services, and Cyber Apps sought a new auditor for its fiscal year 2023 financial statements (the fiscal year ended July 31, 2023) to be included in its Form 10-K, due to be filed with the Commission in October 2023.

27. In or around August 2023, a consultant for Cyber Apps ("Consultant A") posted on Upwork—an online marketplace that connects businesses and freelance professionals—

seeking a "PCAOB Auditor qualified to conduct 10K Audits for Public Companies in USA," and further noting, "[k]indly only apply if you are a registered member with PCAOB."

28. Jindal responded to Consultant A's Upwork post by sending Consultant A a message falsely representing that he was a "Licensed US CPA" and a "Registered Auditor of PCOAB [sic]." Jindal also claimed that he "[a]lready do[es] many similar project[s]" and could conduct the audit within Consultant A's budget and time frame.

29. Jindal's Upwork account, which he used to contact Consultant A, included a profile in which he falsely portrayed himself as a "USA CPA" with a "team of CPA(US)."

30. On August 21, 2023, given Jindal's false and misleading statements described in paragraph 28 above, Consultant A introduced Jindal to Cyber Apps.

31. In Skype messages and other communications with Consultant A, Jindal falsely claimed to perform audit work along with a signing partner and an audit team.

32. For example, in an August 21, 2023, Skype message, Consultant A asked Jindal to send an auditor engagement letter for Cyber Apps, to which Jindal responded that he could not do so yet because he was "on audit at client site," but that he would send it in the next two days and that his team had "[a]lready start[ed] working on" the project.

33. On August 23, 2023, after gathering additional information about Cyber Apps from Consultant A over Skype messages, Jindal told Consultant A that his "signing partner" offered to conduct the Cyber Apps audit for a $3,000 fee.

34. Ultimately, Jindal and Consultant A agreed upon a $2,500 fee for Jindal's purported Cyber Apps audit.

35. On August 23, 2023, Jindal provided Consultant A with a fraudulent engagement letter (the "Engagement Letter"), on what appeared to be Accounting Firm A letterhead with the

address "New Hyde Park, New York, United States," and a New York area phone number.

36. The Engagement Letter falsely represented that Accounting Firm A would audit the financial statements of Cyber Apps; that the audit would be conducted in accordance with PCAOB standards; and that Accounting Firm A would issue a report on completion of the audit for Cyber Apps' Form 10-K report.

37. The Engagement Letter also bore the forged, unauthorized signature of the principal of Accounting Firm A.

38. In fact, Jindal never had any contact with Accounting Firm A or its principal, and Accounting Firm A never authorized Jindal or Jindal's companies, Helponic Global and Helponic Global LLC, to have any affiliation with it.

39. Accounting Firm A never authorized or performed any audit of Cyber Apps, and no one at Accounting Firm A authorized or signed the Engagement Letter.

40. At all relevant times, including at the time of the Engagement Letter, Accounting Firm A was not registered with the PCAOB and was not authorized to conduct an audit in accordance with PCAOB standards for an issuer.

41. Although Accounting Firm A was headquartered in New Hyde Park, New York, the New York area phone number listed on the Engagement Letter was Jindal's phone number, not Accounting Firm A's phone number.

42. On or about August 23, 2023, Cyber Apps' newly appointed President, who was also one of its new directors, countersigned the Engagement Letter.

43. From on or about August 21, 2023 through October 2023, Jindal continued to falsely represent to Cyber Apps that he was affiliated with Accounting Firm A, and that he was performing audit work on behalf of Accounting Firm A along with a partner and team—

including by emailing Cyber Apps purported updates on the audit status, audit-like requests regarding its draft Form 10-K, and revised and edited versions of its Form 10-K.

44. For example, on August 31, 2023, Jindal wrote to Cyber Apps to update it on the status of the audit work and that he and his team were working on "some queries" that he would send in a few days.

45. On September 4, 2023, in response to Jindal's request for payment for the purported audit, the new Chief Executive Officer ("CEO") of Cyber Apps asked to speak with Jindal and for his phone number.

46. On September 5, 2023, Jindal provided the Cyber Apps CEO the same New York area phone number that appeared on the Engagement Letter.

47. In a call on or around September 5, 2023, between Jindal and the Cyber Apps CEO, Jindal falsely represented himself as being associated with Accounting Firm A, and he further falsely stated that Accounting Firm A was qualified to perform the audit.

48. On or around September 8, 2023, in response to a Cyber Apps request for an invoice for payment for the audit, Jindal emailed an invoice to Cyber Apps falsely purporting to be from Accounting Firm A, and listing the same New York contact information included on the Engagement Letter.

49. On September 14, 2023, Cyber Apps paid Jindal for the purported audit by sending $2,500 to a bank account Jindal had provided, which was held in the name of his own company, Helponic Global—not Accounting Firm A.

50. Also on September 14, 2023, Jindal sent Cyber Apps an email with several audit-like requests about Cyber Apps' draft Form 10-K, including regarding the aggregate market value of equity shares held by non-affiliates of Cyber App as of January 31, 2023; the number of

registered owners of Cyber Apps' common stock as of September 12, 2023; and the "guidelines under which the statutory liability has been written off in the books on account of statute of limitations." In the same email, Jindal stated that he would respond within two days after Cyber Apps answered his queries.

51. On September 20, 2023, Jindal responded to an email from Cyber Apps requesting a status update by stating "I can finalize the report" after he received a response to his outstanding September 14, 2023 request regarding the guidelines under which the statutory liability had been written off in the books on account of the statute of limitations—which he emphasized was critical because it would have a "major[]" impact on Cyber Apps' financial statements.

52. On September 20, 2023, certain individuals with Cyber Apps responded by email that they did not have access to the requested information but that someone would look further, to which Jindal responded on the same day: "Let me discuss with my partner regarding the write off of statutory dues."

53. On September 22, 2023, Cyber Apps confirmed by email to Jindal that after looking further, it was unable to identify any records relating to that issue. Jindal responded the same day "Okay" and indicated that he would send the "final" draft by September 26, 2023.

54. On September 25, 2023, Jindal emailed Cyber Apps the purported "final draft of [the] 10 K report," which included Jindal's phony audit report dated September 12, 2023 (the "Draft Audit Report"). Jindal directed Cyber Apps in the email to: "Please review and confirm it, so that I can issue you the final report."

55. The Draft Audit Report appeared as if it was on Accounting Firm A letterhead, with the same contact information as the Engagement Letter.

56. The Draft Audit Report, which contained the unauthorized digital signature (with a "/s") of Accounting Firm A's principal on behalf of the firm, falsely represented, among other things: (1) "I have audited the accompanying balance sheet of Cyber Apps World Inc. and the related statements of income, stockholders equity, cash flows, including the related notes and any related schedules for the years ended July 31, 2023"; (2) "In my opinion the financial statements present fairly in all material respects the financial position of the Company as of July 31, 2023 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America"; (3) "I am a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB)"; and (4) "I have conducted my audit in accordance with the standards of the PCAOB."

57. On or around September 27, 2023, Jindal emailed Cyber Apps another purported "final signed 10K report," which included the same Draft Audit Report.

58. On or around October 13, 2023, after Cyber Apps requested certain additional changes to the Form 10-K, Jindal emailed Cyber Apps an updated Form 10-K with another phony audit report dated October 11, 2023 (the "Final Audit Report"). The Final Audit Report was identical to the phony Draft Audit Report except for the new date of October 11, 2023.

59. Thereafter, Jindal was copied on emails with Cyber Apps relating to finalizing the filing of its Form 10-K using the Commission's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system.

60. On October 25, 2023, after market hours, Cyber Apps finalized and filed with the Commission its Form 10-K, which included Jindal's Final Audit Report.

61. On October 25, 2023, Jindal received an email confirmation that the

Commission's EDGAR system had accepted Cyber Apps' Form 10-K filing.

62. The trading volume in Cyber Apps' stock was 3,704 shares on October 25, 2023, the last day of trading prior to EDGAR's acceptance of its Form 10-K filing (after market-hours).

63. The trading volume in Cyber Apps' stock increased to 4,633 shares on Thursday, October 26, 2023, and then surged to 96,357 shares on Monday, October 30, 2023.

64. In or around December 2023, Cyber Apps and Consultant A learned that Accounting Firm A's PCAOB registration had been revoked, partially revealing Jindal's scheme.

65. On December 15, 2023, after market hours, Cyber Apps disclosed that it had learned that Accounting Firm A was not registered with the PCAOB in a Form 8-K filed with the Commission and amended its fiscal year 2023 Form 10-K to delete the phony audit report and state that the financial statements were unaudited.

66. Thereafter, Cyber Apps retained a PCAOB-registered auditor to audit its financial statements included in its Form 10-K for its fiscal year ended July 31, 2023.

67. On or about April 15, 2024, Cyber Apps reported on a Form 8-K filed with the Commission that, after discussions with its new auditor, Cyber Apps had determined that the company's financial statements for its fiscal years ended July 31, 2022, and July 31, 2023, included in its Form 10-K were inaccurate.

68. On April 17, 2024, Cyber Apps filed a Form 10-K amendment that restated its financial statements for the fiscal years ended July 31, 2022, and July 31, 2023, to, among other things, write down substantially all of the assets it previously reported for both fiscal years, and to increase the liabilities it had reported for its fiscal year ended July 31, 2023.

## III. JINDAL ATTEMPTED TO FRAUDULENTLY OBTAIN OTHER AUDIT WORK AND CONTINUED TO MISREPRESENT HIMSELF AS A CPA

69. In addition to Jindal's misconduct with respect to Cyber Apps, Jindal fraudulently

sought and, in some cases, obtained audit work from other U.S. companies that intended to file audited financial statements with the Commission in Form 10-K reports.

70. For example, Jindal provided Consultant A with a fake engagement letter for another U.S. company for which Consultant A was also a consultant that had the same format and content as the Cyber Apps' Engagement Letter—purportedly from Accounting Firm A, with the same unauthorized and forged signature of Accounting Firm A's principal. Jindal obtained a payment of $2,500 from that company.

71. From 2023 through 2026, Jindal continued to fraudulently seek audit and accounting work through Helponic Global's website, Upwork, and through his Wyoming entity, Helponic Global LLC.

72. Until at least December 2024, Helponic Global's website advertised that it provided a variety of accounting services—including, among other things, "SEC Registrant Services Including SOX, 404 Reporting, and Quarterly Reviews," internal control reviews, and other assurance and attestation services.

73. As of September 2026, Helponic Global's website continued to advertise Helponic Global as a "CPA Firm" providing "Comprehensive CPA Services," including, among other things, financial statement preparation services in accordance with generally accepted accounting principles, tax services "designed to address the multifaceted landscape of US taxation," and services to set up U.S. companies.

74. Jindal has also continued to seek or accept accounting work through Upwork under false pretenses. For example, in January 2026, Jindal obtained a job opportunity posted on Upwork, which sought a "US accountant" for tax filings. In February 2026, through his Wyoming entity Helponic Global LLC, Jindal obtained job opportunities posted on Upwork

titled "CPA Required for Tax Advice" and "US Tax & Accounting Specialist."

75. Jindal also obtained jobs in 2025 through Upwork that sought a "US CPA," "Accounting Expert" for US tax filings, "Annual Tax Reporting and Audit Specialist," and "CPA Required to Review Private Placement Memorandum."

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5**

76. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 75.

77. As alleged above, Jindal, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

78. By reason of the foregoing, Jindal violated, and unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 13(a) and Rule 13a-1**

79. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 68.

80. As alleged above, uncharged entity Cyber Apps violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-1 [17 C.F.R. § 240.13a-1] thereunder.

81. As alleged above, Jindal knowingly or recklessly provided substantial assistance to Cyber Apps with respect to its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-1 [17 C.F.R. § 240.13a-1] thereunder.

82. By reason of the foregoing, Jindal is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Cyber Apps' violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rule 13a-1 [17 C.F.R. § 240.13a-1] thereunder and, unless enjoined, Jindal will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**A.** Permanently enjoining Jindal and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

**B.** Permanently enjoining Jindal and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-1 [17 C.F.R. § 240.13a-1] thereunder, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)];

**C.** Permanently prohibiting Jindal from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the

Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit. For purposes of this paragraph: (1) "Accounting or financial reporting role" means participating in the preparation of financial statements, decisions about financial reporting, the creation or implementation of accounting policies, or decisions about accounting treatment, and (2) "Public company" means a company, foreign or domestic, that files financial statements with the Commission;

**D.** Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, as a result of the alleged violations, and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**E.** Ordering Defendant to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**F.** Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff SEC demands a trial by jury on all issues so triable.

Dated: October 5, 2026

Respectfully submitted,

U.S. SECURITIES AND EXCHANGE COMMISSION

Travis Hill

Sheldon L. Pollock
Wendy B. Tepperman
Laura Yeu
Travis Hill
Michael H. DiTrapani
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-9135 (Hill)
hilltr@sec.gov